Hearing:
November 12, 1987
T. Henderson
Paper No. 36

FOR PUBLICATION IN FULL

U. S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

Marion Laboratories, Inc.
v.
Biochemical/Diagnostics, Inc.

———

Opposition No. 70,004 to application Serial No. 391,903
filed September 29, 1982.

———

Alan S. Cooper and Kathy J. McKnight for Marion Laboratories,
Inc.

Eisenman, Allsopp & Strack and Hoffmann, Dilworth, Barrese &
Baron for Biochemical/Diagnostics, Inc.

———

Before Sams, Cissel and Seeherman, Members.

Opinion by Seeherman, Member:

Marion Laboratories, Inc. has opposed the application
by Biochemical/Diagnostics, Inc. to register "TOXI-PREP" for
"packed chromatographic columns; kits comprised primarily of
chromatographic columns and reagents for in vitro clinical
screening of drugs, all sold as a unit".[1]  As grounds for
opposition, opposer has alleged that, prior to applicant's
claimed date of first use, opposer or its predecessors in

———

[1] Application Serial No. 391,903, filed September 29, 1982
and asserting a date of first use and first use in commerce on
September 17, 1982.

interest[2] have used a family of marks all featuring the prefix "TOXI" for products related to clinical laboratory testing for drugs; that it owns registrations for the following marks and has used these marks for the respective listed goods since prior to applicant's claimed date of first use of its mark:

> "TOXI-DISCS" - adsorbent discs employed in thin layer chromatography, which are impregnated with biologically active compounds such as drugs, for standards in chromatographic analysis; the goods are employed in clinical laboratory testing for chemical identification;[3]

> "TOXI-GRAMS" - chromatograms employed in thin layer chromatography, which are adapted for receiving small disc impregnated with chemicals; the goods are employed in clinical laboratory testing for chemical identification;[4]

> "TOXI-TUBES" - extraction tubes for laboratory use;[5]

> "TOXI-LAB" - diagnostic kit for laboratory use, consisting of reagents and materials--namely, prestandardized chromatograms, chemicals for the preparation of detection reagents and blanks for concentration of an unknown drug;[6]

---

(2) References to "opposer" shall be deemed to include opposer's predecessors in interest.
(3) Registration No. 960,697, issued June 12, 1973, Section 8 affidavit accepted; Section 15 affidavit received.
(4) Registration No. 961,204, issued June 19, 1973, Section 8 affidavit accepted; Section 15 affidavit received.
(5) Registration No. 1,140,688, issued October 21, 1980, Section 8 affidavit accepted; Section 15 affidavit received.
(6) Registration No. 1,157,059, issued June 9, 1981, Section 8 affidavit accepted; Section 15 affidavit received.

"TOXI-KIT" - diagnostic kit consisting essentially of reagents, reagent identification and handling appliances and instructional literature;[7] and

"TOXI-TIPS" - technical information brochures, leaflets, inserts and newsletters concerning drug diagnosis;[8]

that it owns and has used the marks "TOXI-DIP" for detection reagents, "TOXI-CONTROL" for a urine drug control solution, "TOXI-RACK" for a chromatogram holder and "TOXI-PACK" for an assembly of chromatogram extraction tubes and discs since prior to applicant's date of first use; that purchasers and users of opposer's products, and others, have come to recognize opposer's family of "TOXI" prefix marks as indications of origin in opposer; that opposer's products related to chemical laboratory testing for drugs and applicant's goods as identified in its application are likely to be offered through the same channels of trade to the same classes of purchasers and users; and that applicant's mark "TOXI-PREP", used on the goods described in its application, so resembles opposer's previously used and registered family of marks which feature the prefix "TOXI" as to be likely to cause confusion or mistake or to deceive within the meaning of Section 2(d) of the Trademark Act.

---

[7] Registration No. 1,157,061, issued June 9, 1981, Section 8 affidavit accepted; Section 15 affidavit filed.
[8] Registration No. 1,209,682, issued September 21, 1982.

3

In its answer, applicant has admitted that opposer is the owner of registrations for the trademarks "TOXI-DISCS", "TOXI-GRAMS", "TOXI-TUBES", "TOXI-LAB", "TOXI-KIT" and "TOXI-TIPS", and has otherwise denied the essential allegations in the notice of opposition. Applicant also made additional allegations which are essentially elaborations of its position that there is no likelihood of confusion between its mark and opposer's. Applicant further alleged that it is the owner, by assignment, of the trademark "TOXI SKREEN", the date of first use of which "is believed to be earlier than the date of first use of at least two of opposer's trademarks". However, because applicant offered no proof in support of its allegations relating to "TOXI SKREEN", we have considered this defense to have been withdrawn.

The record includes the pleadings; the file of the opposed application; the testimony, with exhibits, of opposer's witnesses Dr. Robert J. Rousseau, opposer's Director of Scientific Licensing and Dr. Vernon Green, Chief of Toxicology Services at Children's Mercy Hospital, Kansas City, Missouri; and the following, all relied on by opposer: certified status and title copies of the registrations alleged in the notice of opposition; opposer's request for admission No. 1, admitted by virtue of applicant's failure to respond; applicant's answers to opposer's Interrogatories Nos. 21 and 22; and portions of the discovery deposition, with exhibits, of Allen Panitz,

4

president of applicant. Applicant has submitted no evidence.[10]

Both parties filed briefs, and opposer filed a reply brief. An oral hearing was held at which only opposer appeared.

The record shows that opposer, first through its predecessor Analytical Systems, Inc., and then, when it acquired this company, through its Analytical Systems division, has sold various products as part of a drug detection system. This system, which is advertised and sold under the trademark "TOXI-LAB", uses an accelerated form of thin layer chromatography to identify any drugs which may be present in a particular specimen. The "TOXI-LAB" system consists of various components, including "TOXI-TUBES" extraction tubes, which are used to separate the drug in the specimen from the aqueous layer into the organic layer, "TOXI-DISCS" discs, which hold the concentrated drug or solvent, "TOXI-GRAMS" chromatograms, which "wick up" the solvent so that drugs are deposited at certain levels, and jars and chemicals to make "TOXI-DIP" detection

---

[10] Applicant has made references in its brief to certain pages from the discovery deposition of its president which were not relied on by opposer. While, in certain circumstances, portions of a discovery deposition may be made of record by the noninquiring party, this may be done only under a notice of reliance. See Trademark Rule 2.120(j)(2), (3), and (4). Because applicant has not complied with the rule, and opposer has objected, only those portions of the discovery deposition relied on by opposer have been considered.

reagents, [11] which are reagents which cause spots of color, correlating to specific drugs, to appear on the chromatogram. Purchasers of the "TOXI-LAB" system receive a "TOXI-KIT" which contains the aforementioned products bearing the trademarks "TOXI-GRAMS", "TOXI-TUBES", "TOXI-DISCS" and "TOXI-DIP", as well as a "TOXI-CONTROL" substance used to assure that the testing process is in control and accurate, and various other supplies and accessories. These products are also available separately under the indicated trademarks, as are a "TOXI-PACK" package containing products bearing the trademarks "TOXI-GRAMS", "TOXI-TUBES" and "TOXI-DISCS".

All of the above-indicated trademarks were in use as early as 1978. In addition, beginning in 1977 opposer furnished to its customers a newsletter called "TOXI-TIPS" which was published approximately once a year. In about 1983 this was incorporated, still under the name "TOXI-TIPS", into the "TOXI-LAB" Drug Compendium. In June, 1982 opposer also offered for sale "TOXI-RACK" wire racks, which enable the user to develop several chromatograms simultaneously.

The "TOXI-LAB" system is used by clinical laboratories, hospital laboratories, forensic laboratories and police department laboratories to determine if a drug or drugs are present in a sample. The results of a test are used for a

_____

(11) While opposer's papers referred to the mark as "TOXI-DIP", in the literature submitted by opposer it has been depicted as "TOXI-DIPS" as well as "TOXI-DIP".

number of purposes: they may be used for preemployment screening, to ascertain whether or not certain medical symptoms are drug related, to determine whether a person was poisoned, to determine whether a patient is taking his medication, to identify drugs found in clandestine laboratories, and so on.

Applicant manufactures various products for laboratories, hospitals and research institutions including diagnostic testing products used in drug detection. Applicant sells columns and some reagents for this purpose under the trademark "TOXI-PREP".[12]  These goods are sold to laboratories, including agricultural laboratories, hospitals and police laboratories. The "TOXI-PREP" products can be used for routine drug screening programs, drug rehabilitation programs, and preemployment screening. While applicant's president was not aware of such use, he testified that it would be possible to use the goods in a hospital emergency room for drug detection, or to screen potential high-risk patients before admitting them to hospitals, or by pharmaceutical houses for quality control on their products.

---

[12] In his discovery deposition applicant's president testified that the identification in the application was inaccurate because applicant does not sell its "TOXI-PREP" products in kit form, but only separately as reagents and columns. If applicant should prevail in this proceeding, we recommend, pursuant to Rule 2.131, that the Examining Attorney require that the identification of goods be amended to reflect the actual use of the mark.

7

Priority is not in issue in this case. Because applicant has not submitted any evidence as to the dates of use of its mark, the earliest date on which it is entitled to rely is September 29, 1982, the filing date of its application. ECI Divison of E-Systems v. Environmental Communications, 207 USPQ 443 (TTAB 1980). Opposer has demonstrated use of all the marks indicated above since prior to that date, and has also made of record its registrations for the trademarks "TOXI-DISCS", "TOXI-GRAMS", "TOXI-TUBES", "TOXI-LABS", "TOXI-KIT" and "TOXI-TIPS".

Nor is there any issue that the goods of the parties are very similar. Both parties' products are used for the same purpose--drug detection by means of thin line chromatograms, and the products are also used in the same environment--laboratories. Both parties have also advertised their products in the same trade publications, and have promoted them at trade shows of the same organization. Thus, customers and potential customers would be exposed to both parties' marks. Moreover, there is evidence that both parties' goods are found in the same laboratories, applicant's president having stated that opposer's "TOXI-" products and applicant's "TOXI-PREP" products are sold to some of the same laboratories.

As for the marks, it is opposer's position that it has a family of "TOXI" marks and that purchasers are likely to believe that applicant's "TOXI-PREP" products are part of opposer's family.

8

It has been held that in order to establish ownership of a family of marks it must be shown by competent evidence "first, that prior to the entry into the field of the opponent's mark, the marks containing the claimed 'family' feature or at least a substantial number of them, were used and promoted together by the proponent in such a manner as to create public recognition coupled with an association of common origin predicated on the 'family' feature; and second, that the 'family' feature is distinctive (i.e. not descriptive or highly suggestive or so commonly used in the trade that it cannot function as the distinguishing feature of any party's mark)." Land-O-Nod Co. v. Paulison, 220 USPQ 61, 65-66 (TTAB 1983).

The evidence submitted by opposer shows that it has met the first part of the test. As noted above, it has demonstrated use of all its claimed "TOXI-" marks prior to the September 29, 1982 filing date of applicant's application, the earliest date on which applicant may rely. Indeed, the record shows that opposer has used the marks "TOXI-LAB", "TOXI-GRAMS", "TOXI-DISCS", "TOXI-KIT", "TOXI-TIPS", "TOXI-DIP(S)", "TOXI-CONTROL" and "TOXI-PACK" since at least as early as 1978 and "TOXI-RACK" since June 1982. Further, opposer has submitted ample evidence that, prior to applicant's use of "TOXI-PREP", opposer has used and promoted its marks together. For example, the record shows that opposer produced brochures in which several of its marks ("TOXI-LAB", "TOXI-GRAMS", "TOXI-TUBES" "TOXI-DISCS") were advertised, and opposer distributed the brochures at trade shows and to customers and prospective

9

customers. Opposer also produced price lists showing all the
"TOXI-" marks named above. These price lists are sent to
opposer's 2500 name customer list and are also used as a sales
tool and to describe opposer's products. The promotional
material enjoys a wide distribution, opposer having testified
that each piece is printed in runs of ten thousand. Moreover,
the goods on which opposer uses the "TOXI-" marks are all
related to its drug detection system, whether as components,
replacement supplies or informational materials, and thus
purchasers are generally exposed to several of the marks at once
and would be likely to associate the goods bearing the "TOXI-"
prefix with a common source. Further, opposer has demonstrated
recognition of the "family" feature, the Chief of Toxicology
Services of Children's Mercy Hospital in Kansas City having
testified that people in clinical toxicology identify the
"TOXI-" prefix with opposer's Analytical Systems division.

The second requirement for demonstrating a family of
marks is to show that the family feature is distinctive. This
is because the "family" concept is bottomed on the recognition
of the common feature as the distinguishing feature of each
mark. American Standard Inc. v. Scott & Fetzer Co., 200 USPQ
457 (TTAB 1978). Case law tells us that if the asserted family
feature is descriptive or highly laudatory or commonly used in
the trade it cannot serve as the basis for a family of marks, at
least in the absence of a showing of distinctiveness. See, J.
McCarthy, Trademarks and Unfair Competition, 2d ed., §23.19 at
p. 104, and cases cited therein. However, this is not to say

10

that a _suggestive_ portion or term cannot function as a family feature. See, Duffy-Mott Co., Inc. v. Borden, Inc., 201 USPQ 846 (TTAB 1978); In re Carnation Co., 196 USPQ 716 (TTAB 1977); Aloe Creme Laboratories, Inc. v. Aloe 99, Inc., 188 USPQ 316 (TTAB 1975); Norwich Pharmacal Co. v. Salsbury Laboratories, 168 USPQ 250 (TTAB 1970). Such a determination would depend on whether the common feature would be recognized by the relevant public, so that the public would ascribe a common origin to marks containing the common feature, and this determination would depend on the particular fact situation.

Applicant argues that "TOXI-" does not function as the distinguishing feature of opposer's marks because it is "so descriptive or highly suggestive and so commonly used in the trade...." brief, p. 10. However, there is nothing in the record to show that the "TOXI-" prefix is commonly used in the trade, nor to show that it has been commonly adopted and registered by third parties.[13] In fact, the only evidence of third-party adoption of a "TOXI-" mark is the registration for "TOXI-PAK" for diagnostic chemical reagents for laboratory use[14] originally cited against applicant's application; the

(13) Applicant has referred to various third-party registrations in its brief, and has attached a copy of a search report and an unidentified advertisement purporting to show third-party use of "TOXI". However, this evidence is manifestly untimely and therefore has not been considered.
(14) Registration No. 1,000,866, issued January 7, 1975, Section 8 affidavit accepted; Section 15 affidavit received.

existence of this registration is insufficient to establish that "TOXI-" cannot be a distinguishing feature of opposer's marks.

Applicant also argues that "TOXI" is descriptive of drugs or poisons, and has requested that we take judicial notice of the following dictionary definitions:[15]

> "Toxicology"--the scientific study of poisons, their effects, their detection, and the treatment of the conditions produced by them.
>
> "Toxico-"--a combining form meaning poison, as in toxicogenic: also, before a vowel, toxic-.
>
> "Toxic"--1. poisonous. 2. of, pertaining to, affected by, or caused by a toxin, or poison.

We take judicial notice of these definitions, as well as that for "TOXI-" as "(comb form) 1. toxic: poisonous 2. toxin: poison.[16]

However, we cannot conclude from these definitions that "TOXI" is descriptive of opposer's products. While drugs may be considered poisons, it requires a several-step thought process to associate "TOXI" with drug detection products. Thus, it is our view that "TOXI" is no more than suggestive of opposer's goods.

---

(15) Webster's New Universal Unabridged Dictionary, 2d ed., copyright 1983.
(16) Webster's Third New International Dictionary, Unabridged, copyright 1976.

Applicant has cited numerous cases involving suggestive terms as the common element where no family of marks was found. We will not discuss these cases in detail, but note that they involve different fact situations and, as stated above, the determination of whether a suggestive element does serve as the basis for a family of marks turns on the facts of the particular case.[17]

We conclude that on the facts presented herein opposer has demonstrated a family of marks consisting of the prefix "TOXI-" and a suffix portion which is either highly suggestive or descriptive of the goods in connection with which the mark is used (e.g. "TOXI-DISCS" for discs; "TOXI-GRAMS" for chromatograms). Further, we conclude that applicant's mark "TOXI-PREP", consisting of the prefix "TOXI-" and a portion of the descriptive term "preparation", is so similar to opposer's family of marks that, when applied to chromatographic columns and reagents used for the clinical screening of drugs, applicant's mark "TOXI-PREP" is likely to be perceived as another member of opposer's family, and is thus likely to cause confusion.

_____
(17) To the extent that the cases may indicate that a suggestive term cannot serve as the basis for a "family," we believe that interpretation is too restrictive and is inconsistent with the Trademark Act, which allows registration of suggestive terms on the Principal Register without resort to Section 2(f).

Finally, we touch briefly on applicant's argument that confusion is not likely because the parties' goods are used in laboratories by trained personnel. We are not persuaded by this argument, since the expertise of a person in his field does not necessarily mean that he will be knowledgeable about trademarks, or that his technical skill will avoid confusion. See, OPTOmechanisms, Inc. v. OPTOelectronics, Inc., 175 USPQ 246, 249 (TTAB 1972). In this case, given the similarity in the parties' marks and the fact that they both utilize the same process--thin line chromatography--for the same purpose--drug detection, it is not unreasonable to assume that even trained laboratory personnel who are familiar with opposer's family of marks might well assume that applicant's goods also originate with opposer.

Decision: The opposition is sustained.

J. D. Sams

R. F. Cissel

E. J. Seeherman
Members, Trademark
Trial and Appeal Board

14

FEB 2 1988