**This Opinion is a Precedent of the TTAB**

Hearing: January 24, 2018                          Mailed: August 23, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re FabFitFun, Inc.*

_____

Serial No. 86847381

_____

Jill M. Pietrini of Sheppard Mullin Richter & Hampton LLP
     for FabFitFun, Inc.

Nicole Passman,[1] Trademark Examining Attorney, Law Office 125,
     Mark Pilaro, Managing Attorney.

_____

Before Cataldo, Mermelstein and Coggins,
     Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

FabFitFun, Inc. ("Applicant") seeks registration on the Principal Register of the

standard character mark I'M SMOKING HOT for

> Cosmetics and makeup; personal care products, namely, body lotion,
> body butter, shower gel, soap, body polish, body and foot scrub, and non-
> medicated skin creams; fragrances; body shimmer powder; non-
> medicated lotions and gels for face and body care; non-medicated skin
> care preparations; essential oils; false eyelashes; fingernail decals;
> fingernail embellishments; hair care preparations; incense; nail care
> preparations; non-medicated bath preparations; non-medicated lip care

---

[1] The Trademark Examining Operation reassigned this case to Ms. Passman after the appeal was instituted.

preparations; non-medicated sun care preparations; non-medicated toiletries; perfumes; potpourri; room fragrances; shaving preparations, soaps for personal use in International Class 3.[2]

The Trademark Examining Attorney has refused registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's mark, when used in connection with the identified goods, so resembles the mark SMOKIN' HOT SHOW TIME in standard characters, registered on the Principal Register for "cosmetics, mascara," in International Class 3,[3] as to be likely to cause confusion, mistake or deception.

When the refusal was made final, Applicant appealed and filed a request for reconsideration. Subsequently, the Examining Attorney denied the request for reconsideration and the Board resumed the appeal. The Examining Attorney and Applicant filed briefs and presented arguments at an oral hearing before this panel. We reverse the refusal to register.

## Likelihood of Confusion

When the question is likelihood of confusion, we analyze the facts as they relate to the relevant factors set out in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the relatedness of the

---

[2] Application Serial No. 86847381, filed on December 13, 2015, based upon Applicant's allegation of a bona fide intent to use the mark in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b).

[3] Registration No. 4883039, issued on January 5, 2016.

goods or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). We discuss the *du Pont* factors for which Applicant and the Examining Attorney have presented evidence and arguments. "Not all of the [*du Pont*] factors are relevant to every case, and only factors of significance to the particular mark need be considered." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1719 (Fed. Cir. 2012) (quoting *In re Mighty Leaf Tea,* 601 F.3d 1342, 94 USPQ2d 1257 (Fed. Cir. 2010)).

A.  Relatedness of the Goods/Channels of Trade/Consumers

With regard to the goods, channels of trade and classes of consumers, we must make our determinations under these factors based on the goods as they are identified in the application and cited registration. *See In re Dixie Rests. Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1534 (Fed. Cir. 1997). *See also Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002); *Octocom Sys., Inc. v. Hous. Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). A proper comparison of the goods "considers whether 'the consuming public may perceive [the respective goods or services of the parties] as related enough to cause confusion about the source or origin of the goods and services.'" *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1086 (Fed. Cir. 2014) (quoting *Hewlett-Packard*, 62 USPQ2d at 1004).

In this case, the goods in the application and cited registration are identical as to "cosmetics." In view of the identity of the recited "cosmetics," there is no need for us

to further consider the relatedness of the goods. *See SquirtCo v. Tomy Corp.*, 697 F.2d 1038, 216 USPQ 937, 938-39 (Fed. Cir. 1983) (holding that a single good from among several may sustain a finding of likelihood of confusion); *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (likelihood of confusion must be found if there is likely to be confusion with respect to any item that comes within the identification of goods or services in the application). Nonetheless, the Examining Attorney has also submitted internet website evidence demonstrating that third parties provide cosmetics as well as incense, room fresheners, skin care products and fragrances under the same marks.[4] Thus, while unnecessary to our determination, the Examining Attorney has established that these additional goods are related to the "cosmetics" identified in the cited registration.[5]

"The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed." *Octocom Sys., Inc.,* 16 USPQ2d at 1787. Because the goods identified in the application and the cited registration are in-part identical as to "cosmetics," we must presume that the channels of trade and classes of purchasers of

---

[4] March 30, 2016 Office Action at .pdf 9-15; October 7, 2016 Office Action at .pdf 16-50.

Page references to the application record refer to the downloadable .pdf version of the United States Patent and Trademark Office (USPTO) Trademark Status & Document Retrieval (TSDR) system. References to the briefs refer to the Board's TTABVUE docket system.

[5] We further observe that Applicant presented no argument or evidence regarding the relatedness of the goods.

"cosmetics" are the same as to these goods. *See In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *Genesco Inc. v. Martz,* 66 USPQ2d 1260, 1268 (TTAB 2003) ("Given the in-part identical and in-part related nature of the parties' goods, and the lack of any restrictions in the identifications thereof as to trade channels and purchasers, these clothing items could be offered and sold to the same classes of purchasers through the same channels of trade"); *In re Smith & Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers").

We find that the *du Pont* factors of the relatedness of goods, channels of trade and classes of consumers weigh in favor of likelihood of confusion.

B. Conditions of Sale

Neither identification of goods restricts the recited cosmetics by price. In the absence of any limitations suggesting otherwise, we find that the cosmetics at issue include lower cost make-up items that may be purchased without a high degree of care.[6] "When products are relatively low-priced and subject to impulse buying, the

---

[6] Internet evidence of record shows various cosmetics offered for sale at $12 to $32, and the goods identified in the cited registration offered for sale at €1.99, which would appear to be a modest price in U.S. dollars. October 7, 2016 Final Office Action at 26-50; Applicant's response to the Examining Attorney's first Office Action at 70-78. These relatively inexpensive items may be subject to impulse purchase. *See L'Oreal S.A. v. Marcon,* 102 USPQ2d 1434, 1441 (TTAB 2012); *Wet Seal Inc. v. FD Mgmt. Inc.,* 82 USPQ2d 1629, 1640-41 (TTAB 2007). Although the latter evidence apparently reflects the price of cosmetics in a foreign market, we have given it limited weight to the extent it confirms that cosmetics can include relatively inexpensive items. Applicant does not contend that cosmetics are limited to high-priced items such that consumers would exercise a heightened degree of care in their purchasing decisions.

risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot Inc. v. M.C. Becton,* 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000). As a result, this *du Pont* factor also favors a finding of likelihood of confusion.

C.  Strength or Weakness of the term Smokin'/Smoking Hot for Cosmetics

We consider the conceptual strength of "smokin(g) hot" in relation to cosmetics. The Examining Attorney submitted the following definition of "smoking hot:" "attractive, sexy looking, very hot."[7] In the context of cosmetics, we find that this definition indicates that the purpose or intended result of the cosmetics offered under the marks at issue is to render the user's appearance "smoking hot." Given the meaning "smoking hot" has in relation to the goods, the term has some degree of conceptual weakness in connection with cosmetics and is at best highly suggestive when used in connection with such goods.

We next consider Applicant's argument concerning the number and nature of third-party uses of "smokin' hot" for beauty products. Applicant argues that in "its Office Action Response and Request [for] Reconsideration, Applicant presented evidence of *many* third party marks that employ the term SMOKIN HOT for beauty products."[8] In support of this contention, Applicant introduced into the record with its September 26, 2016 Response to the Examining Attorney's first Office Action screenshots from third-party websites displaying various "SMOKIN' HOT" formative

---

[7]  March 3, 2016 first Office Action at .pdf 7-8. Definition retrieved from macmillandictionary.com/us/dictionary/American/smoking-hot.

[8] 7 TTABVUE 20.

marks and other uses in connection with a variety of cosmetics, including the following:[9]

bobbibrowncosmetics.com, on a page titled BOBBI BROWN SMOKING HOT, offers Smokey Eye cosmetics prizes to women who submit photos to #SmokingHot under the banner ARE YOU #SMOKINGHOT?;

vibe.com contains an article on a page titled MAC Cosmetics Launches Smoking Hot Temperature Rising Collection, discussing MAC Cosmetics' new line of cosmetics entitled Temperature Rising, although it appears that the term "Smoking Hot" is used by the author to describe the collection rather than as a trademark or trade name;

drugstore.com offers for sale Wet n Wild MegaLast Lip Color, in the color Smokin' Hot Pink 905D;

amazon.com offers for sale Too Faced SMOKIN' HOT LASHES mascara and eyeliner;

facebook.com features a page entitled Smokin' Hot Makeup, an online store offering clothing and jewelry, but apparently not makeup;

amazon.com.uk offers for sale Barry M Cosmetics Eyeshadow Palette, Smokin Hot, although the price therefor is listed in pounds, and it is not clear to what extent, if any, this webpage will be viewed by consumers in the United States; and

ebay.com.uk offers for sale Maybelline SMOKIN' HOT Mascara Eyeliner Color Tattoo Xmas Gift Set containing mascara and eyeliner, although it is not clear to what extent this webpage will be viewed by U.S. consumers.

Applicant further introduced into the record with its April 14, 2017 Request for Reconsideration additional screenshots from the following third-party websites:[10]

essie.com offers for sale SMOKIN' HOT nail polish;

amazon.com offers for sale Layer'r Shot Deodorant, Smokin Hot;

---

[9] At .pdf 132-177.

[10] At .pdf 9-33.

amazon.com offers for sale Bare Escentuals Eye Shadow (Smokin' Hot);

amazon.com offers for sale e.l.f. Nail Polish, Smokin Hot and e.l.f. Super Glossy Lip Shine Smokin' Hot;

amazon.com offers for sale L.A. Girl Inspiring Eyeshadow Palette, You're Smokin' Hot!;

amazon.com offers for sale Ultime Pro Matte Lip Crayon Smokin' Hot; and

ebay.com offers for sale Pop Beauty Smokin' Hot Eyeshadow Trio.

Applicant thus has made of record a total of ten third-party uses of SMOKIN' HOT formatives as marks for cosmetics in general and, in particular, eye makeup of various colors and shades. In addition, Applicant introduced four other examples of SMOKIN' HOT used either as marks in the United Kingdom, or as descriptive terms applied to makeup, although as noted above, it is not clear to what extent, if any, U.S. consumers will be exposed to these UK websites. While Applicant has not presented specific evidence concerning the extent and impact of these uses, it nevertheless presented "evidence of these marks [incorporating the phrase 'smokin' hot'] being used in internet commerce" for the cosmetics and mascara identified in the cited registration. "Evidence of third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin*, 396 F.3d 1369, 73 USPQ2d 1689, 1693 (Fed. Cir. 2005) (citation omitted). Internet printouts, such as those offered by Applicant, "on their face, show that the public may have been exposed to those internet websites and therefore may be aware of the advertisements contained therein." *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98

USPQ2d 1066, 1072 (TTAB 2011). While the Federal Circuit has held that "*extensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established,*" *see Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.,* 797 F3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015) (emphasis added) (citing *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015)), we believe that the record of third-party use in this case reflects a more modest amount of evidence than that found convincing in *Jack Wolfskin* and *Juice Generation* wherein "a considerable number of third parties' use [of] similar marks was shown." *Id.*[11] Ultimately, we do not believe the evidence of weakness here is as persuasive as that in either *Juice Generation* or *Jack Wolfskin*.

Nevertheless, based on the totality of the evidence, including the dictionary definition, we find that the shared phrase SMOKIN' [SMOKING] HOT is somewhat

---

[11] Applicant also made of record with its September 26, 2016 Response to the Examining Attorney's first Office Action copies of 18 third-party registrations, issued on the Principal Register to a number of entities for SMOKING HOT or SMOKIN' HOT formative marks for a variety of goods and services that are unrelated to those at issue, including cigar stores, websites featuring barbeque and grilling videos, computer game software and gaming machines, yoga instruction, restaurant and catering services, electronic cigarettes, hats, women's health consulting services, and food items. In this case, however, because none of the third-party registrations introduced into the record by Applicant recite goods or services relating to goods identified in the challenged application and cited registration, this evidence has little, if any, probative value with regard to the weakness of the cited mark as to cosmetics and mascara. *See Palm Bay*, 73 USPQ2d at 1693 ) ("Evidence of third-party use of similar marks *on similar goods* is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection.") (emphasis added; citation omitted); *In re i.am.symbolic, LLC*, 866 F.3d 1315, 123 USPQ2d 1744, 1751 (Fed. Cir. 2017) (disregarding third-party registrations for goods in other classes where the proffering party "has neither introduced evidence, nor provided adequate explanation to support a determination that the existence of I AM marks for goods in other classes, … support a finding that registrants' marks are weak with respect to the goods identified in their registrations"); *accord Hunt Foods & Indus., Inc. v. Gerson Stewart Corp.*, 367 F.2d 431, 151 USPQ 350, 353 (CCPA 1966).

weak in that it at best suggests a desired result of using the identified cosmetics, while the third-party uses discussed above tend to show consumer exposure to third-party use of the term on similar goods. Overall, we find the evidence suggests that consumers of cosmetics will look not just to the "SMOKIN' [SMOKING] HOT" component of marks containing the phrase to identify and distinguish source, but also to the other parts of the marks. Here, the other part of the registered mark is SHOW TIME, and there is nothing in the record to indicate that this aspect of the registered mark is strong or weak.[12] Accordingly, we find on this record that the component "SMOKIN' HOT" is somewhat weak.

The registered mark, SMOKIN' HOT SHOW TIME, on the other hand, has not been shown to be either particularly strong or particularly weak. On balance, we do not believe that, on this record, the relative strength of the cited mark in its entirety weighs significantly one way or the other. Rather, the relative weakness of the component term SMOKIN' HOT common to both marks weighs somewhat in favor of a finding of no likelihood of confusion.

D. Similarity/Dissimilarity of the Marks

We consider Applicant's mark I'M SMOKING HOT and the registered mark SMOKIN' HOT SHOW TIME and compare them "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En* 1772, 396 F.3d 1369, 73 USPQ2d 1689, 1691

---

[12] A dictionary definition of SHOWTIME, discussed *infra*, does not establish that the term is weak in relation to the identified goods.

(Fed. Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). The marks "must be considered … in light of the fallibility of memory." *St. Helena Hosp.*, 113 USPQ2d at 1085 (quoting *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 196 USPQ 1 (CCPA 1977)). The proper focus is on the recollection of the average consumer, who retains a general rather than specific impression of the marks. *Winnebago Indus., Inc. v. Oliver & Winston, Inc.*, 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975); *see also Gegenuber Dem Julichs-Platz v. Chesebrough-Pond, Inc.*, 470 F.2d 1385, 176 USPQ 199, 200 (CCPA 1972) ("Side-by-side comparison is not the test. The focus must be on the 'general recollection' reasonably produced by appellant's mark and a comparison of appellee's mark therewith.") (citation omitted). Because, as found earlier, the goods at issue in this appeal are cosmetics without any reference to price point, the average consumer includes ordinary users of cosmetics.

As a preliminary point, at oral hearing, Applicant's counsel argued that customers occasionally refer to the products identified in the cited registration by the mark SHOW TIME SMOKIN' HOT, rather than the way it is registered — SMOKIN' HOT SHOW TIME, and that we should consider this other construction of the mark in making our determination regarding its similarity to the mark in the involved application. Applicant relies, for this proposition, on the decision of the Federal Circuit in *In re Hearst Corp.*, 982 F.2d 493, 25 USPQ2d 1238, 1239 (Fed. Cir. 1992). Applicant's reliance upon *Hearst* is nevertheless inapposite.

The Federal Circuit in *Hearst* stated as follows:

The Board, analyzing the marks for confusing similarity, found that "varga" was the dominant element of the VARGA GIRL mark, and that "girl" was merely descriptive and thus could not be afforded substantial weight in comparing VARGA GIRL with VARGAS. The Board erred in its analytic approach. Although undoubtedly "varga" and "vargas" are similar, the marks must be considered in the way they are used and perceived. *See In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985). Marks tend to be perceived in their entireties, and all components thereof must be given appropriate weight. *See Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 23 USPQ2d 1471 (Fed. Cir. 1992).

The appearance, sound, sight, and commercial impression of VARGA GIRL derive significant contribution from the component "girl". By stressing the portion "varga" and diminishing the portion "girl", the Board inappropriately changed the mark. Although the weight given to the respective words is not entirely free of subjectivity, we believe that the Board erred in its diminution of the contribution of the word "girl". When GIRL is given fair weight, along with VARGA, confusion with VARGAS becomes less likely.

*Id.* In *Hearst*, the Federal Circuit held that the Board failed to give appropriate weight to the term GIRL in our consideration of the relatedness of the VARGA GIRL mark to the VARGAS mark in the cited registration. When read in context, it is clear that the Federal Circuit's decision in *Hearst*, consistent with longstanding precedent and subsequent decisional law, stands for the proposition that we must consider the mark as registered or applied for in its entirety, not that we must consider a variation on the registered mark because consumers may refer to it in such a manner. In this case, registration has been refused based on the mark in the cited registration, not on any variation of it that the registrant or its customers may in fact use. Therefore, in determining whether confusion is likely we limit ourselves, as we must, to a

comparison of the applied-for mark with the registered mark. *See In re Viterra,* 101 USPQ2d at 1908, (citing *du Pont,* 177 USPQ at 567).

The only common element in the marks is the term SMOKIN' HOT/SMOKING HOT and, as discussed above, this term is weak as a source identifier in the field of cosmetics. *See In re Bed & Breakfast Registry*, 229 USPQ 818, 819 (Fed. Cir. 1986) ("The record shows that a large number of marks embodying the words 'bed and breakfast' are used for similar reservation services, a factor that weighs in favor of the conclusion that BED & BREAKFAST REGISTRY and BED & BREAKFAST INTERNATIONAL are not rendered confusingly similar merely because they share the words 'bed and breakfast.'"); *see also* Trademark Manual of Examining Procedure (TMEP) § 1207.01(b)(viii) (October 2017) and authorities cited therein ("If the common element of two marks is 'weak' in that it is generic, descriptive, or highly suggestive of the named goods or services, it is unlikely that consumers will be confused unless the overall combinations have other commonality."). While we are mindful that weak marks still deserve protection from registration of a similar mark for similar goods/services, *see China Healthways Institute, Inc. v. Wang*, 491 F.3d 1337, 1340, 83 USPQ2d 1123, 1125 (Fed. Cir. 2007), the registered mark is not SMOKIN' HOT but rather SMOKIN' HOT SHOW TIME. We must evaluate whether that mark in its entirety is sufficiently similar to Applicant's mark I'M SMOKING HOT that consumers would mistakenly believe the goods emanate from a common source.

As an initial matter, the informal spelling of SMOKIN' in the registered mark versus the traditional spelling of SMOKING in Applicant's mark does little to create a distinction between them. For words ending in —ing, the elision of the final letter "g" and addition of an apostrophe is a common form of contraction that would be easily recognized by prospective purchasers. "Contractions of a term do not alter the essential identity of character and meaning between the full word and the contraction." *In re South Bend Toy Mfg. Co.*, 218 USPQ 479, 80 (TTAB 1983) (LIL' LADY BUGGY *vs.* LITTLE LADY); *In re Strathmore Prods., Inc.*, 136 USPQ 81, 82 (TTAB 1962) ("it is ... apparent that these marks have the same meaning for, in effect, the registered mark [GLISS'N] is but a contraction of the word "glisten.").

Regarding the appearance and sound of the marks, in Applicant's mark I'M SMOKING HOT the term SMOKING HOT modifies the term I'M. By contrast, SMOKIN' HOT in the registered mark SMOKIN' HOT SHOW TIME, modifies the term SHOW TIME. This difference in structure renders the marks only somewhat similar in appearance and sound.

Turning to connotation and overall commercial impression, as discussed above, "smoking hot" is defined as "attractive, sexy looking, very hot."[13] In relation to cosmetics, the term "smokin[g] hot" appears to describe or at best suggest a desired result of using the goods, i.e., that they will make one appear to be attractive and sexy. Use of the term "smokin[g] hot" by third parties, discussed above, supports this

---

[13] March 3, 2016 first Office Action at .pdf 7-8. Definition retrieved from macmillandictionary.com/us/dictionary/American/smoking-hot.

meaning. "Show time" is defined as "the time at which an entertainment, such as the showing of a movie, is scheduled to start; *slang* the time at which an activity is to begin."[14] Thus, Applicant's mark connotes an individual's declaration that "I am attractive or sexy looking," and the registered mark connotes the time for sexy entertainment or activity to begin. These connotations and the overall impressions conveyed by the marks in their entireties are more different than they are similar. While both generally connote attractiveness or sexiness due to the shared component SMOKIN' HOT/SMOKING HOT, Applicant's mark in its entirety conveys the impression of a statement regarding one's personal appearance and the registered mark conveys sexy entertainment.

Taken in their entireties, the marks are more dissimilar than similar in appearance, sound and connotation and, overall, convey somewhat different commercial impressions. In view thereof, the *du Pont* factor of the similarity or dissimilarity of the marks favors a finding of no likelihood of confusion.

E. Balancing the Factors

In conclusion, we find that the goods are identical in part as to "cosmetics" and are presumed to be available in the same channels of trade at all price points to the same classes of consumers. However, the marks I'M SMOKING HOT and SMOKIN' HOT SHOW TIME are more dissimilar than similar, and evidence of record establishes that, while the registered mark in its entirety is neither strong nor weak,

---

[14]  5 TTABVUE 46. Applicant's April 14, 2017 Request for Reconsideration. Definition retrieved from ahdictionary.com/word/search.html?q=showtime.

the marks' common term SMOKIN' HOT or SMOKING HOT is relatively weak in connection with the goods at issue. Because of the overall differences between the marks and the weakness of the term shared by them, we find that confusion is not likely between Applicant's mark I'M SMOKING HOT and the mark SMOKIN' HOT SHOW TIME in the cited registration.

*Decision*: The refusal to register based on likelihood of confusion under Section 2(d) of the Trademark Act is reversed.